### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DONALD W.E.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Case No. 3:20-CV-00948-MAB |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | |

### MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.[2]

### Procedural History

Plaintiff applied for DIB on March 13, 2018, alleging a disability onset date of July 28, 2015 (Tr. 305; 318; 416).[3]  The claim included the following impairments that Plaintiff described limited his ability to work: back surgery at L5-S1; neck fusion; numbness in his left leg and foot; numbness of his hands; and depression (Tr. 416). The claim proceeded

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (*See* Doc. 8).

[3] Plaintiff filed an earlier application in October 2016, which was initially denied on December 8, 2016 and again on April 12, 207, making the benefit period covered by his March 2018 application commence with the date of April 13, 2017.

to a hearing before Administrative Law Judge ("ALJ") Stuart Janney, who denied Plaintiff's application on October 30, 2019 (Tr. 243-263). The Appeals Council denied Plaintiff's request for review on January 10, 2019, making the ALJ's decision the final agency decision subject to judicial review (Tr. 1-7). Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following issue:

1. The ALJ failed to properly evaluate Plaintiff's Residual Functional Capacity ("RFC") because the ALJ independently interpreted radiographic evidence of Plaintiff's spine and did not obtain necessary missing records from Plaintiff's doctor, Dr. Rerri.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[4] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have

---

[4] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.,* and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.,* and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.    *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v.*

*Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that Plaintiff had had not engaged in substantial gainful activity since July 28, 2015, Plaintiff's alleged onset date (Tr. 248).

Plaintiff was born on July 15, 1971 and was 44-years old on the alleged disability onset date (Tr. 256). The ALJ found that Plaintiff had severe impairments of lumbar spondylosis; degenerative disk disease of the cervical spine; degenerative disk disease of the thoracic spine; and neuropathy (Tr. 248).

The ALJ found that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. §404.1567(b) with the following limitations:

> He can occasionally climb ramps and stairs, but should never climb ladders, ropes, or scaffolding. He can occasionally balance.

(Tr. 250).

Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could not perform his past work as a warehouse worker (Tr. 256). Ultimately, the ALJ found Plaintiff was not disabled, though, because he was able to do other jobs that exist in significant numbers in the national economy (Tr. 257).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in preparing

this Memorandum and Order. The following summary of the record is directed to the points and factual allegations raised by Plaintiff.

### 1. Evidentiary Hearing

Plaintiff was represented by an attorney at the August 22, 2019 hearing. (Tr. 267). Plaintiff testified at the hearing that he completed the 10th grade and did not receive a high school diploma (Tr. 272). Plaintiff is married with three children, two of whom were living at home at the time of the hearing (Tr. 273). Due to Plaintiff's ailments, he can bathe himself, but his wife and daughter have to help him get dressed (Tr. 279). Plaintiff explained he struggles to bend forward and usually struggles to cook (Tr. 279-280). But, on a good day, he can pull a chair by the grill and cook for his family (Tr. 280). He uses a charcoal grill and has to have someone else lift the charcoal bag (*Id.*). Plaintiff testified that he is depressed because he is unable to work (Tr. 281). Plaintiff testified that his daughter plays volleyball, but he is unable to make it through an entire volleyball game because of the pain (Tr. 280-281).

The ALJ questioned Plaintiff about his prior work history. Plaintiff testified that he stopped working in July 2015 (Tr. 273). Before that, he worked for Statewide Tire as a warehouse worker (*Id.*). This job entailed lifting, rolling, and throwing tires, which means that as part of the work, he lifted over 100 lbs. (Tr. 274).

Plaintiff testified that his physical issues began with a car accident. At the time of the accident he had pain near his left rib cage (Tr. 274). He decided not to get into an ambulance and went home instead, but after dinner, the pain moved up the back of his neck and increased (*Id.*). Plaintiff testified that at the time of the hearing, he had two

surgeries on his low back and his doctor was recommending a third (Tr. 274; 277). Plaintiff also testified that he had one neck surgery (Tr. 275; 277). Plaintiff wore a thoracic brace because he has three degenerative disks in his thoracic region and there is nothing that the doctors can do besides instruct him to wear the brace (Tr. 275). Plaintiff testified he is supposed to wear the brace whenever he is up for a period of time, but that he has to take breaks from the brace so his spine does not depend on it (*Id.*). Plaintiff takes medications for his injuries, has completed physical therapy, and received injections (Tr. 276). These other treatments did not help, so Plaintiff explained that his doctor wanted to do another surgery (*Id.*).

Plaintiff testified he is most comfortable laying down and when he isn't, he has to adjust himself multiple times. In fact, he had to adjust his position multiple times at the hearing (Tr. 275). Plaintiff testified that the pain is constant, but it does vary in intensity throughout the day (Tr. 277). Moving around, which Plaintiff described as walking, sitting, laying down, and reclining, helps the pain, but he gets the most relief from pain while reclining and laying down so gravity is not pulling on his spine (*Id.*). Plaintiff testified that he usually reclines most of the day (*Id.*). At this time, Plaintiff cannot lift more than 15 lbs. (*Id.*).

Plaintiff explained that he cannot stand or walk for two hours at a time without having to sit down (Tr. 278). For example, Plaintiff struggles to complete a trip to Walmart, which usually lasts 20-30 minutes (*Id.*). He cannot sit for two hours at a time (*Id.*). He explained that his doctor is around 45 minutes from his home and he, at times, has to stop on the way to the doctor to get out of the car and move around (Tr. 279). The

medicine he takes for the pain causes him to be dizzy and sleepy (*Id.*).

Plaintiff's attorney questioned him as well. Plaintiff testified that on a 1 to 10 scale (with 10 being intense pain that requires an immediate emergency room visit), his pain, in general, is around a 4 with medication (Tr. 282). Without medication, though, Plaintiff testified the pain is so significant he would not want to live (Tr. 282). Plaintiff explained that on average, "over 20" days a month, his pain is greater than a 4 and can go up to a 10 (Tr. 282-283). Plaintiff testified that he has one good day, where the pain is a 2 or 3, about once every 1-2 weeks (Tr. 283). Plaintiff explained that he cannot sleep at night and usually gets about 1-2 hours of sleep before having to get up to relieve the pain and get more pain medications (Tr. 283-284). On average, Plaintiff gets around 1-2 hours of full sleep (Tr. 284). Prior to the accident, Plaintiff explained that he loved to camp, fish, hunt, ride motorcycles, and play in the yard with his kids, but he has not been able to do any of these hobbies and activities since the accident (Tr. 285).   Plaintiff explained that he would not be able to do a job where he would have to sit or stand during the day, inspecting something on an assembly line or something similar, because he would not be able to concentrate due to the pain (*Id.*). While his neck surgery was fairly successful and he only has occasional neck pain, the majority of his pain is centered in his midback and lower back, as well as his left leg and foot (Tr. 286).

Plaintiff testified that he had an independent medical examination with a Dr. Mirkin for worker's compensation and he met with Dr. Mirkin for around 3-5 minutes (Tr. 286).

A VE also testified at the hearing. The VE testified that his testimony was

consistent with the DOT and if the DOT was silent on anything, the VE testified based on his experience and education (Tr. 287-288; 292). The VE assessed Plaintiff's prior work as a warehouse worker, tire distribution center (DOT number 922.687-058) as having an exertional level of medium, unskilled and a Specific Vocational Preparation ("SVP") level of 2[5], but as Plaintiff described it, the VE believed it was more consistent with very heavy, unskilled work (Tr. 288). The ALJ asked the VE to assess a hypothetical person younger than Plaintiff who has a limited education and shares Plaintiff's past work experience and if this hypothetical person could perform the demands of light work; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolding; and could occasional balance (Tr. 288-89). With these limitations, the ALJ asked the VE to determine if there was any light, unskilled occupations the hypothetical person could perform and the VE answered in the affirmative. The VE said this person could perform the work of an unskilled assembler (DOT 706.684-022), which is light, unskilled work with approximately 295,000 jobs in the national economy (Tr. 289). The second job is that of an unskilled hand packer position (DOT 920.687-018), which is unskilled and has approximately 311,000 jobs (Tr. 289). The final job the VE testified this hypothetical

---

[5] Specific vocational preparation, or "SVP", is the amount of time required for a typical claimant to: learn the techniques, acquire the information, and develop the facility needed for average performance in a job. A claimant may acquire SVP in a school, military, institutional, or vocational environment through such settings as: vocational training, apprenticeship training, in plant training, on-the-job training, and essential experience in other jobs. For example, a registered nurse has an SVP of seven, which means that a claimant can learn this job in about 2-4 years. If the job is assessed as an SVP of 1, it means that only a short duration is needed to learn the job. In this case, a 2 means that it would take up to 1 month to learn the job. *See here* DI 25001.001 Medical and Vocational Quick Reference Guide, available at https://secure.ssa.gov/poms.nsf/lnx/0425001001#a7 (last accessed March 15, 2022).

person could complete was that of a light, unskilled inspector position (DOT 727.687-062), of which there are 117,000 jobs nationwide (Tr. 289).

The ALJ then asked the VE to assume the same hypothetical limitations except that this time, the VE should assess someone who requires sedentary work, as opposed to light, and that this individual can stoop, kneel, crouch, and crawl. The VE testified that there would be some sedentary, unskilled work this person could complete (Tr. 289-290). For example, this person could do a sedentary, unskilled assembler (DOT 713.687-018), of which there are 34,000 jobs nationwide (Tr. 290). He could also be a sedentary, unskilled hand packer (DOT 559.687-014), of which there are 21,000 positions (*Id.*). Finally, the VE testified that this person could complete the work of a sedentary, unskilled inspector position (DOT 739.687-182) of which there are 12,000 jobs nationwide (*Id.*). The VE testified that even if someone had to change positions (from seated to standing or vice versa) every 10 minutes, they could do the sedentary positions as described and would likely be able to keep up with the quality and quantity of productivity required in these positions   (Tr. 291). With that said, the VE testified that it was hard to predict the number of employers who would allow this accommodation, so there would be a reduction in the numbers of available jobs he testified to (*Id.*). The VE testified that if the hypothetical person needed to walk away or lay down for relief every hour, there would be no work at the sedentary or light level this person could maintain (Tr. 292). The VE explained that for unskilled work, one day of absenteeism is allowed per work month (*Id.*).

Plaintiff's attorney questioned the VE, and asked whether employers of unskilled professionals tolerate off-task time, and the VE explained that while employers vary, they

generally tolerate no more than 15% of off-task time (Tr. 292-293). The VE also explained that outside of regularly scheduled breaks (which would be a 10 or 15-minute break in the first half of the day; a meal in the middle for approximately 30 minutes; and a second 10 or 15 minute break in the second half of the day), an employer would not allow an employee to lie down (Tr. 293).

### 3.    Relevant Medical Records

Plaintiff submitted medical records from a variety of providers to aid the ALJ in his determination.

Plaintiff was injured in a motor vehicle collision in February 2015 (Tr. 699). At the emergency room after the accident, Plaintiff complained of neck and thoracic pain, which was more noticeable on the left side and was getting worse over time (Tr. 699). X-rays of his cervical, thoracic, and lumbar spine were generally negative (Tr. 697; 702-704). Plaintiff was seen for short-term physical therapy after being referred by his primary care physician, Dr. Robert Frost (Tr. 813-821).

Dr. Bernard Rerri, MD, is Plaintiff's treating orthopedic surgeon. Dr. Rerri first started seeing Plaintiff on July 28, 2015 and reported that he saw him monthly after that (Tr. 969). Dr. Rerri identified Plaintiff's previous neck fusion[6], laminectomy[7], thoracic

---

[6] A neck fusion is a surgical remedy for issues with neck vertebrae, in which a damaged disk is removed, a bone graft is inserted, and the vertebrae are fastened together with a plate and screws.  *See* MAYO CLINIC, *Fusion from front of neck,* https://www.mayoclinic.org/tests-procedures/spinal-fusion/multimedia/img-20156133 (last visited March 15, 2022).

[7] Laminectomy is a surgery that creates space by removing the lamina (back part of a vertebra that covers the spinal canal). This is also known as decompression surgery. The surgery enlarged the spinal canal to relieve pressure on the spinal cord or nerves. *See* MAYO CLINIC, *Laminectomy,*

spondylosis[8], and lumbar disk herniation[9] as severe conditions (Tr. 969). Dr. Rerri explained that Plaintiff's neck, back, and leg pain have lasted over twelve months and result in approximately 6 bad days in a 28-day period (Tr. 969). He explained that Plaintiff's ability to stand, walk, and sit are limited to 10-minute intervals and for two hours in an 8-hour day (*Id.*). At the time of completing this impairment questionnaire, Dr. Rerri explained that Plaintiff was not working, so he could not say if the patient would need a job that permits movement changes (Tr. 970). Dr. Rerri noted that Plaintiff would be off task for 40% of the workday and requires a back brace (*Id.*). Dr. Rerri explained Plaintiff's postural limitations, which included crouching, squatting, stooping, bending, climbing stairs, and climbing ladders due to his ailments (*Id.*). Dr. Rerri outlined that Plaintiff would miss approximately 2 days of work a week due to his impairments (*Id.*).

About five months after the accident, Plaintiff had an MRI on July 15, 2015, which showed L5-S1 [10] level disc degeneration with broad-based left paracentral and

---

https://www.mayoclinic.org/tests-procedures/laminectomy/about/pac-20394533 (last visited March 15, 2022).

[8] Thoracic spondylosis refers to the wear and tear that happens to vertebrae (spinal bones) over time, resulting (at times) in bony disks and joints cracking. *See* HEALTHLINE, *Thoracic Spondylosis Symptoms and Treatment,* https://www.healthline.com/health/thoracic-spondylosis (last visited March 15, 2022).

[9] A herniated disk refers to a problem with one of the rubbery cushions (disks) that sit between the bones (vertebrae) that stack to make your spine. *See* MAYO CLINIC, *Herniated Disk,* https://www.mayoclinic.org/diseases-conditions/herniated-disk/symptoms-causes/syc-20354095 (last visited March 15, 2022). A lumbar herniated disk refers to a herniated disk in the lower part of the back, comprised of five vertebral bodies (L1-L5) that extend from the lower thoracic spine (the chest) to the sacrum (bottom of the spine). *See* SPINE-HEALTH, *Lumbar Spine Definition,* https://www.spine-health.com/glossary/lumbar-spine (last visited March 15, 2022).

[10] The L5-S1 spinal motion segment is the transition region between the lumbar spine and the sacral spine in the lower back. Because of its position and distinctive anatomy, it receives a higher degree of mechanical stress and loads compares to the segments above it. These characteristics make the L5-S1 susceptible to traumatic injuries, degeneration, disk herniation, and/or nerve pain. *See* SPINE-HEALTH, *All about L5-S1*

posterolateral disk protrusion and a small disk extrusion which obliterate the left lateral recess and also causes moderate narrowing of the left neural foramen and moderate central canal stenosis[11] (Tr. 668-69). Dr. Rerri performed lumbar surgery on June 2, 2016, which consisted of a hemilaminectomy and diskectomy[12] at L5-S1 (Tr. 654-55). Almost one year later, Plaintiff had an MRI that demonstrated post-surgical findings of fluid collection adjacent to the laminectomy site, which was causing Plaintiff significant pain (Tr. 615-616). On August 22, 2016, due to Plaintiff's complaints of pain, Dr. Rerri performed a second surgery at the L5-S1 level, during which he drained a subfascial seroma and addressed residual stenosis at L5-S1 left lateral recess and performed a left L5-S1 hemilaminectomy and decompression (Tr. 599-600). Plaintiff was seen for physical therapy two days later, at which time he was given the goals of improving trunk flexibility to 75% of normal, display increased trunk rotational movements with his gait, and demonstrate a less guarded posture in 8 weeks (Tr. 567-568). Plaintiff attended physical therapy as scheduled, which occurred through mid-October 2016 (Tr. 571-579).

---

*(Lumbosacral Joint),* https://www.spine-health.com/conditions/spine-anatomy/all-about-l5-s1-lumbosacral-joint (last visited March 15, 2022).

[11] Stenosis is a narrowing of the spaces within your spine, which can put pressure on the nerves that travel through the spine. *See* MAYO CLINIC, *Spinal Stenosis,* https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961 (last visited March 15, 2022).

[12] A laminectomy is a surgery that creates space by removing parts of the vertebra that cover the spinal canal. It is also known as a decompression surgery, as it enlarges the spinal canal to relieve pressure on the spinal cord and nerves. *See* MAYO CLINIC, *Laminectomy,* https://www.mayoclinic.org/tests-procedures/laminectomy/about/pac-20394533 (last visited March 15, 2022). A diskectomy is a surgical procedure to remove the damaged portion of a herniated disk in the spine. A herniated disk can irritate or compress nearby nerves, so a diskectomy is effective for treating pain that radiates down arms/legs. *See* MAYO CLINIC, *Diskectomy,* https://www.mayoclinic.org/tests-procedures/diskectomy/about/pac-20393837 (last visited March 15, 2022).

During Plaintiff's September 23, 2016 physical therapy session, the therapist noted that Plaintiff was holding his body in a "guarded position," likely due to pinched nerves in his neck (Tr. 576). Plaintiff had an MRI on September 19, 2016 of his cervical spine (as ordered by Dr. Rerri (Tr. 580). The MRI revealed that Plaintiff had degenerative disk disease with a small left paracentral herniated nucleus pulsus at the C5-C6 level[13] which indented the ventral aspect of the thecal sac and impinged on the ventral aspect of the cervical cord and ipsilateral nerve root and also borderline central canal stenosis at C6-C7 (*Id.*).

Plaintiff's last physical therapy session was on October 3, 2016. The physical therapist noted that while Plaintiff was improving, he does need breaks for pain in his neck (Tr. 574). The note also indicates that Plaintiff was discharged from physical therapy by his doctor so that Plaintiff could try shots to address his pain (*Id.*). The physical therapist indicated that Plaintiff would benefit from more physical therapy, as he had not met any of the goals at that time, and he was still experiencing numbness and tingling in his left lower extremity (Tr. 582).

On October 25, 2016, Shane Fancher, MD, a pain clinic physician, evaluated Plaintiff for complaints of neck pain (Tr. 564-565). Dr. Fancher described that Plaintiff was experiencing "severe" pain across his shoulder area and had herniated disks at both C5-

---

[13]  The C5-C6 spinal motion segment (located in the lower cervical spine just above the C7 vertebra) provides flexibility and support to much of the neck and the head above. *See* SPINE-HEALTH, *All About the C5-C6 Spinal Motion Segment,*   https://www.spine-health.com/conditions/spine-anatomy/all-about-c5-c6-spinal-motion-segment (last visited March 15, 2022).

6 and C6-7, which caused some spinal stenosis. The pain prevented Plaintiff from sleeping since it was a constant burning and throbbing feeling, which Plaintiff described as a "7/10" on the day of the examination and, on average, a "5/10" most days (Tr. 564). While medication helped the pain, Plaintiff reported that the pain is constant and is worse with sitting, standing, driving, sneezing, lifting, bending, and sex (*Id.*). Dr. Fancher noted that Plaintiff could not raise his arms overhead or look up without pain, and that he had tenderness in his neck around the C6-C7 level (Tr. 565). Dr. Fancher recommended a low volume epidural steroid injection at the left C6-7 as treatment (*Id.*). Dr. Fancher performed the injection at Plaintiff's C5-C6 level on November 15, 2016 (Tr. 563). He then performed a second epidural steroid injection at the C6-C7 level on December 16, 2016 (Tr. 559). Dr. Fancher advised it would be better to operate and fix the issues in Plaintiff's neck rather than continue to do injections (Tr. 934).

Plaintiff returned to Dr. Rerri on August 10, 2017 for the same constant neck pain affecting his left arm (Tr. 859). Plaintiff also explained experiencing pain affecting his left leg. Dr. Rerri and Plaintiff decided to move forward with surgery - an anterior cervical decompression and fusion of the neck, which Dr. Rerri performed on November 16, 2017 (Tr. 720; 722-724). Dr. Rerri noted prior to surgery that the MRI of Plaintiff's cervical spine showed cord compression at C5-6 and C6-7 consistent with Plaintiff's complaints (Tr. 720). Plaintiff had a post-operative visit on December 1, 2017, during which he said he was "overall better," but complained of right shoulder pain and numbness to the left forearm and fingers (Tr. 865). Plaintiff returned for a second follow-up appointment on December 21, 2017, during which he complained of lower back pain, left leg numbness,

and continued numbness of the forearm and fingers of his left arm (Tr. 866).

Dr. Rerri referred Plaintiff back to physical therapy and an evaluation was performed on January 5, 2018 (Tr. 867-871). At the time, Plaintiff reported that his neck pain had improved from the surgery and ranges from a 0/10 (when resting comfortably) to a 4/10 when doing activities (Tr. 867). Overall, Plaintiff reported that his neck is 70% better, but his back pain is significant and the "primary limiter" at the time (Tr. 870).

Plaintiff returned to Dr. Rerri's office on March 22, 2018 and complained of thoracolumbar pain with forward radiation (Tr. 895). Dr. Rerri noted that Plaintiff is in "stable chronic pain on narcotics" (*Id.*). Plaintiff returned for an appointment with Dr. Rerri on May 4, 2018 and explained that he was having more trouble with his back and leg (Tr. 896). The issues with Plaintiff's back pain and left leg numbness continued throughout Plaintiff's follow-up appointments on August 3 and August 8, 2018 (Tr. 898, 900). Therefore, Dr. Rerri ordered an MRI of Plaintiff's thoracic spine, which occurred on August 20, 2018 (Tr. 900). The MRI revealed that Plaintiff had a disk bulge at T6-T7[14] and no significant spinal stenosis or neural foraminal stenosis (Tr. 900). Because Plaintiff was still exhibiting persistent mid-thoracic back pain that was not helped by the epidurals or medications, Dr. Rerri prescribed a thoracic lumbar sacral orthosis brace (TLSO) (Tr. 899; 1023). Additionally, Dr. Rerri instructed Plaintiff to see his primary care physician to exclude non-spinal causes for this chronic pain (Tr. 1024).

---

[14] The thoracic spine has 12 nerve roots (T1-T12) on each side of the spine that branch from the spinal cord and control motor and sensory signals for the upper back, chest, and abdomen. *See* SPINE-HEALTH, *Thoracic Spinal Nerves*, https://www.spine-health.com/conditions/upper-back-pain/thoracic-spinal-nerves (last visited March 15, 2022).

In December 2018, Dr. Rerri ordered a CT scan of Plaintiff's cervical spine (Tr. 1015). The CT scan demonstrated that Plaintiff had mild cervical disk degeneration and mild spinal canal stenosis at C6-7, with foraminal narrowing at C3-C4, C5-C6, and C6-C7 (Tr. 987-988).

Dr. Rerri ordered another MRI in April 2019, after seeing Plaintiff on April 19 and hearing his complaints of new onset low back pain and bilateral leg pains that were worse on the right side (Tr. 1026). The MRI occurred on May 7, 2019 and showed that Plaintiff had broad-based disk herniation with severe left foraminal encroachment, which caused compression on the nerve at L5-S1 (Tr. 1018). At the L4-L5 level, the MRI showed that Plaintiff has a midline protrusion of disk material and a midline small disk herniation with moderate central canal stenosis (Tr. 1018-1019). The radiologist explained that Plaintiff's symptoms may be extending from a left S2 nerve root sleave (Tr. 1019).

After reviewing this MRI, Dr. Rerri ordered a left L4 and L5 epidural steroid injection as treatment based on the MRI on June 13, 2019 (Tr. 1020; 1027). Plaintiff testified at the hearing before the ALJ that this June injection was unsuccessful and he did not get relief from it so Dr. Rerri was discussing whether to do a third surgery (fourth overall) on Plaintiff (Tr. 276).

On January 16, 2020, Dr. Rerri performed a left L5-S1 revision hemilaminectomy and decompression (Tr. 237-238).

### 4.   Agency Forms

In a Function Report submitted on April 19, 2018, Plaintiff detailed that he cannot lift, squat, stand for long periods of time, sit for long periods of time, and cannot put on

his own socks (Tr. 451). He further explains that his wife takes care of him and prior to his injury, he could do "everything" (Tr. 452). He explains that he cannot do chores or cook anymore, but he will go to the grocery store with his wife for 20-30 minutes maximum and only when needed (Tr. 452-454). Prior to his injury, he liked to fish and watch races at the track, but cannot do those activities anymore due to his injury (Tr. 455).

Plaintiff's wife also submitted a Function Report, dated on or around April 19, 2018 (Tr. 429), in which she described that Plaintiff cannot "do anything" without being in pain (Tr. 430). She further explains that she has to do everything for the family because all Plaintiff can do is recline in the recliner or lay down due to his pain (Tr. 430-431). She described that Plaintiff cannot cook, do yard work, play with their kids, or even have any hobbies due to the severe pain (Tr. 429-434). She said his depression makes it difficult for him to get motivated, but he is able to cook his own meals (Tr. 204-205).

Plaintiff filled out another Function Report, dated September 7, 2018, in which he detailed that he cannot lift more than 15 lbs. and is unable to stand, sit, or walk for long periods of time (Tr. 472). In fact, he has to switch positions from sitting to standing and vice versa every 30 minutes. *Id.* He explained that his wife takes care of everything and he cannot put socks or shoes on by himself (Tr. 473). He explains he isn't able to do any chores, like the laundry or yard work, due to pain (Tr. 474-475).

### 5.   State Agency Consultants' Opinions

In connection with Plaintiff's application for benefits, the ALJ also considered evidence and opinions from State Agency Consultants.

Dr. Michael Nenaber, MD (an internal medicine physician) completed an RFC

report dated June 19, 2018 at the request of the State agency (Tr. 301). Dr. Nenaber determined that Plaintiff could complete light work; sit and stand for approximately 6 hours in an 8-hour workday; and could frequently lift 10 pounds while occasionally lifting 20 pounds (Tr. 301-302). Additionally, Dr. Nenaber determined that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (Tr. 302).

Dr. Marion Panepinto, MD (an internal medicine physician), also completed an RFC report dated September 26, 2018 at the request of the State agency (Tr. 315). Dr. Panepinto also determined that Plaintiff could occasionally climb ramps and stairs (as well as balance), but never climb ladders, ropes, or scaffolds (Tr. 314). Dr. Panepinto determined that Plaintiff's ability to stoop, kneel, crawl, and crouch was "unlimited" (Tr. 314). Additionally, in the section in which Dr. Panepinto was to explain the postural limitations and what evidence was used to determine those limitations, Dr. Panepinto simply stated "see above" (Tr. 314).

### 6.    Worker's Compensation Consulting Medical Examiners

Plaintiff submitted records from his worker's compensation application. Dr. Peter Mirkin, MD (an orthopedic spine surgeon) conducted a medical examination of Plaintiff on September 23, 2015 at the request of the worker's compensation carrier for Plaintiff's employer (Tr. 902). Dr. Mirkin reviewed medical records as well as conducted a physical examination of Plaintiff, and determined he could return to work without restrictions and there was no rationale for Plaintiff to have taken off work in August 2015 (Tr. 905). Dr. Mirkin reviewed additional medical records not previously reviewed, and issued two separate opinions on January 17, 2017 and April 25, 2017 stating that his opinion was

unchanged from his original September 23, 2015 report (Tr. 909-911; 912-914).

Plaintiff was also seen by David T. Volarich, DO, who completed a report dated August 14, 2019 (Tr. 1032). Dr. Volarich reviewed Plaintiff's medical records and conducted a physical examination. Dr. Volarich determined that Plaintiff had reached the maximum medical improvement based on the treatment provided up until the date of the report (Tr. 1041). Additionally, Dr. Volarich determined that Plaintiff should perform work-related activities "to tolerance" (including both standing and sitting) and Plaintiff should "change positions frequently to maximize comfort and rest when needed" (Tr. 1041-42).

## Analysis

In this appeal, Plaintiff advances two main arguments in support of his contention that remand is appropriate. He asserts that the ALJ erred in the course of making his RFC determination by independently interpreting radiographic evidence regarding Plaintiff's spine (Doc. 21-1, p. 9). Second, he asserts that the ALJ erred in formulating his RFC by not obtaining missing records from Dr. Rerri (*Id.* at p. 11).

Defendant argues that the ALJ's decision is supported by substantial evidence, as he based the RFC determination on the record as a whole. Additionally, Defendant argues that Plaintiff has the burden of production and persuasion for steps one through four of the analysis, with the burden shifting to Defendant only at step five (Doc. 22, p. 8). Ultimately, the ALJ was not required to recontact Dr. Rerri for additional treatment notes (*Id.* at p. 6). Finally, Defendant argues that Plaintiff was represented by counsel at the hearing and did not produce an opinion for an examining medical provider that

would support further or greater limitations than those found by the ALJ; therefore, Plaintiff's arguments fail and remand would be improper.

Plaintiff's main argument is that the ALJ did not properly develop the RFC. The RFC is a measure of what an individual can do despite his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000–01 (7th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of a claimant's RFC is a legal decision rather than a medical one. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing' basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3.

The ALJ determined that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the intensity, persistence, and limiting effect described by Plaintiff was not consistent with the evidence in the record as a whole, including the medical evidence (Tr. 251). To reach this determination, the ALJ relied on Plaintiff's medical records, but ultimately found that Plaintiff could still work because his allegations of debilitating physical impairments were contradicted by the "generally stable, physicians' interpretations of objective findings from imaging, physicians' interpretations of objective findings on physical examinations, and conservative treatment with medications" (Tr. 253). The ALJ noted that Dr. Rerri did not

increase Plaintiff's pain medication and that Plaintiff was not in "acute distress" when seeking treatment from Dr. Frost. Additionally, the ALJ noted that while Plaintiff underwent surgeries, which indicates that his symptoms were "genuine," the course of his surgeries had concluded and his course of treatment is stable (Tr. 251; 253).[15]  As such, the RFC was appropriate.

Plaintiff argues that the ALJ impermissibly interpreted two MRI results on his own, including one from May 2019 and one from July 2015. It is well established that "an ALJ may not 'play[ ] doctor' and interpret 'new and potentially decisive medical evidence' without medical scrutiny." *Randall R. L. v. Comm'r of Soc. Sec.*, No. 1:19-CV-141-MGG, 2021 WL 717529, at *3 (N.D. Ind. Feb. 23, 2021) (citing *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018)) (alteration in original) (quoting *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014)); *see also Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014); *Akin v. Berryhill*, 887 F.3d 314, 317–18 (7th Cir. 2018); *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982). Courts give ALJs some freedom to determine exactly "how much evidence is sufficient to develop the record fully and what measures (including additional consultative examinations) are needed in order to accomplish that goal." *Id.*, quoting *Poyck v. Astrue*, 414 F. App'x 859, 861 (7th Cir. 2011). "An ALJ need recontact medical sources only when the evidence received is inadequate

---

[15] The Court notes that the ALJ determined that Plaintiff's treatment was stable despite Plaintiff's testimony that his doctor wanted to conduct another surgery (Tr. 274, 276-277), which was performed on January 16, 2020 (Tr. 237-238), after the ALJ's decision was issued.

to determine whether the claimant is disabled." *Id.* (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).

The Court will focus its examination on Plaintiff's May 2019 MRI results.[16]  These results appear in the ALJ's decision when he explains why he believes Plaintiff is only capable of sedentary work, as opposed to light work (Tr. 254). He explains that while the light exertional level was consistent with the record prior to May 2019, the new treatment records support finding he is capable of a sedentary exertional level. In support, the ALJ cites to two exhibits—13F/26 and 13F/19—and explains he is modifying the determination by the State agency physicians that Plaintiff could perform light work based on Plaintiff's symptoms as presented to his providers and at the hearing (Tr. 254-255). Additionally, the ALJ determined that this modification of the state agency physicians' recommendations is based on "a commonsense consideration that a person with left leg numbness and back pain would likely have difficulty with the standing and walking requirements associated with light work" (Tr. 255).

A close look at exhibit 13F/19 shows that the ALJ is citing to Plaintiff's MRI results from May 7, 2019 (Tr. 1018). The MRI results indicate that Plaintiff has a far left lateral protrusion of his disk and mild stenosis at L5-S1; midline protrusion of his disk at L4-L5 midline broad-based small disk herniation with moderate central canal stenosis; and mild posterior protrusion of his disk at L2-L3 (Tr. 1018). Exhibit 13F/26 is a patient log from

---

[16]  The Court is not convinced that the ALJ impermissibly interpreted the July 2015 MRI results, as it appears the ALJ simply summarized the MRI results, which is allowable and will be explained further in this Order (*See* Tr. 251).

Plaintiff's March 15, 2019 visit to Dr. Rerri's office (Tr. 1025). In this medical note, Dr. Rerri indicates that Plaintiff is in "stable chronic pain," and, "uses thoracic brace" (Tr. 1025). The note also indicates that Plaintiff is prescribed Norco 10-325mg every 6-8 hours. Based on the ALJ's decision, it appears he disagrees with the state agency physicians who determined that Plaintiff actually needed more limited work based on two medical records that were not before the state agency physicians when they conducted their reviews on June 19, 208 and September 26, 2018 (Tr. 301, 315).

Plaintiff argues the ALJ impermissibly interpreted this MRI result to reach this decision. In support, Plaintiff cites to a series of cases. In response, Defendant does not directly address Plaintiff's argument; rather, Defendant cites to other portions of the ALJ's decision to show that the ALJ relied on a totality of the evidence to reach his decision, never acknowledging whether the ALJ impermissibly interpreted the MRI results without a required medical opinion (Doc. 22, p. 4). Plaintiff is correct and remand is appropriate.

An ALJ is permitted to summarize medical records, of course in the discussion of medical history in his decision. In fact, "accurate paraphrasing of the 'impressions' listed in x-ray files is not the Court's concern." *Theresa M. v. Saul*, No. 19 C 3135, 2020 WL 7641286, at *5 (N.D. Ill. Dec. 23, 2020)(quoting *Brown v. Barnhart*, 298 F. Supp. 2d 773, 791 (E.D. Wis. 2004)) (holding ALJ did not play doctor by rephrasing the impression of a physician who reviewed the MRI); *Michael B. v. Berryhill*, No. 18 C 236, 2019 WL 2269962, at *7 (N.D. Ill. May 28, 2019) (finding ALJ did not play doctor by citing to an MRI and summarizing the radiologist's conclusions). That isn't the case here with the May 2019

MRI. The ALJ modified the recommendations of the state agency physicians based on the May 2019 MRI. Plaintiff cited to three cases in support of his argument—*Lambert v. Berryhill*; *Akin v. Berryhill*; *and McHenry v. Berryhill*—and the Court agrees they are analogous.

The ALJ and the Commissioner are not medical experts qualified to interpret MRI reports. "ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves." *Crystal D. H. v. Comm'r of Soc. Sec.*, No. 20-CV-742-RJD, 2022 WL 488142, at *4 (S.D. Ill. Feb. 17, 2022) (citing *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018)). In *Akin,* the ALJ interpreted MRI results that became part of the record *after* the state agency physicians had completed their review, like in this case. *Akin v. Berryhill,* 887 F.3d 314, 317 (7th Cir. 2018). How the ALJ interpreted the MRI results was also similar, as the *Akin* ALJ determined, on his own, that the MRI results were consistent with the plaintiff's complaints and used this determination to formulate the RFC. *Id.* The Seventh Circuit determined that "without an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment." *Id*. Explaining further, the MRI results "may [have] corroborate[d] Akin's complaints, or they may [have] len[t] support to the ALJ's original interpretation, but either way the ALJ was not qualified to make his own determination without the benefit of an expert opinion." *Id.* at 317-18. The Seventh Circuit consequently remanded the case "because the ALJ impermissibly interpreted the MRI results himself." *Id.* at 318.

Even Defendant's tangential argument that the ALJ relied on other evidence does not save the Commissioner's case. Defendants in similar cases have made this argument

and courts have determined that it is not an appropriate defense. *See Crystal D. H.*, 2022 WL 488142 at *4 ("The imaging evidence in both *Akin* and *McHenry* also did not "stand alone in a vacuum" and the ALJs in those cases also considered the testimony of the plaintiffs as well as other medical evidence and medical opinions in arriving at their conclusion. *Akin* is clear that **"**without an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment.") (internal citation omitted). In fact, the Seventh Circuit is explicit that MRIs, which consist of technical language, do not lend themselves to summary conclusions made by lawyers and judges unfamiliar with medical documentation and reports, and MRI results must be evaluated by a doctor. *Israel v. Colvin,* 840 F.3d 432, 439 (7th Cir. 2016).

The remedy for a situation like this touches on Plaintiff's second argument in favor of remand, which is that the ALJ erred in not obtaining missing records from Dr. Rerri. The Seventh Circuit has made it clear that in these situations, the ALJ should seek additional records. For example, in *Akin v. Berryhill,* after determining the ALJ was unqualified to make his own determination as to medical records without an expert opinion, the Seventh Circuit held, "The ALJ had many options to avoid this error; for example, he could have sought an updated medical opinion." *Akin,* 887 F.3d at 317-18, quoting *Green v. Apfel,* 204 F.3d 780, 782 (7th Cir. 2000). District Courts have found similarly. *See Theresa M. v. Saul*, No. 19 C 3135, 2020 WL 7641286, at *4 (N.D. Ill. Dec. 23, 2020), citing *Hughes v. Berryhill*, No. 17 C 5468, 2018 WL 3647112, at *8 (N.D. Ill. Aug. 1, 2018) ("The *Hughes* Court determined that, '[w]ithout an expert opinion from a medical

source,' the ALJ was 'not qualified to conclude that mild bilateral patellofemoral joint space narrowing [was] inconsistent with [the claimant's] complaints of knee pain and limitation'."). In both of these cases, the courts remanded the decision and ordered the ALJ on remand to seek expert medical opinions to review and interpret the medical records to assist the ALJ in formulating the RFC.

Ultimately, the purpose of the ALJ is to "build an accurate and logical bridge between the evidence and the result." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014). Here, the ALJ failed to meet that burden by improperly interpreting Plaintiff's MRI results to modify the RFC. Additionally, the ALJ erred in not seeking out additional medical information to review and interpret the medical records. As such, remand is proper.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

IT IS SO ORDERED.

DATED: March 18, 2022

s/ Mark A. Beatty
MARK A. BEATTY
United States Magistrate Judge